UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| FIELDTURF USA, INC., <br><br> Plaintiff, <br><br> v. <br><br> LUKE MCCOY and KAESTLE BOOS ASSOCIATES, INC., <br><br> Defendants. | Civil Action No.: 3:24-cv-01878 <br><br> JURY DEMAND <br><br><br> November 26, 2024 |

## COMPLAINT

Plaintiff FieldTurf USA, Inc. ("Plaintiff" or "FieldTurf"), by and through its undersigned counsel, for its complaint against Luke McCoy and Kaestle Boos Associates, Inc. ("KBA," and together with Luke McCoy, the "Defendants"), alleges in support as follows:

## NATURE OF THE ACTION

1. FieldTurf, which designs, manufactures, and sells cutting-edge sports surfaces, is one of the world's preeminent artificial turf companies. In January 2024, FieldTurf presented the Town of Colchester Board of Education with a proposal for a comprehensive plan to upgrade the athletic facilities at the Bacon Academy campus. FieldTurf successfully won the contract to perform design services for the Bacon Academy, and although this initial contract only covered design work, as the project's designer and a leading artificial turf contractor, FieldTurf was well-positioned to secure the subsequent construction contract to implement those designs.

2. Defendants, however, had different plans. Beginning in March 2024, Defendant Luke McCoy and his architecture firm, Defendant KBA, embarked on a campaign to damage FieldTurf's reputation and business prospects with the Town of Colchester with an eye towards driving business away from FieldTurf and towards KBA and a FieldTurf competitor with whom

McCoy has longtime contacts. Through a series of false and disparaging statements about FieldTurf and related parties, Defendants have interfered with FieldTurf's existing contract and future business opportunities, causing significant harm to FieldTurf's reputation and business interests.

3. Defendants have continued undeterred on this misguided endeavor, refusing to retract their false statements despite receiving multiple cease-and-desist letters from counsel for FieldTurf, as well as receiving a similar letter from counsel for the Town of Colchester Board of Education. Most recently, McCoy falsely accused a subcontractor associated with FieldTurf of commercial bribery and then doubled-down on this accusation after it was publicly reported by various news organizations.

4. Not only have Defendants already tarnished FieldTurf's business reputation, but they also plainly intend to continue attacking the company for their own reasons, thereby necessitating this legal action.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 as the matter in controversy exceeds the sum of $75,000 and because the parties are citizens of different states.

6. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendants reside within this district and because a substantial part of the events giving rise to FieldTurf's claims occurred within this district.

**PARTIES**

7. Plaintiff FieldTurf USA, Inc. is a corporation organized and existing under the laws of the State of Florida with its principal place of business at 175 N. Industrial Boulevard, Calhoun, GA 30701.

8. Defendant Luke McCoy is a principal of Defendant Kaestle Boos Associates, Inc. and, upon information and belief, a citizen of Connecticut.

9. Defendant Kaestle Boos Associates, Inc. is a corporation organized and existing under the laws of the State of Connecticut with its primary place of business in Connecticut.

**FACTUAL BACKGROUND**

**I.     FieldTurf's Business**

10. FieldTurf is trusted around the world for its ability to provide safe, durable, and cost-effective artificial sports surfaces. FieldTurf currently has over 25,000 installations worldwide for professional franchises (including the National Football League, Major League Soccer, Major League Baseball, and more); National College Athletic Association Division I, II, and III programs; and schools and municipalities.

11. FieldTurf has also installed its artificial turf products and provided related design services in Connecticut. FieldTurf has provided these services for Trinity Health Stadium in Hartford; Central Connecticut State University in New Britain, CT; Southern Connecticut State University in New Haven, CT; Eastern Connecticut State University in Mansfield; Enfield Public Schools in Enfield, CT; Joel Barlow High School in Redding, CT; Fairfield University in Fairfield, CT; and the City of Norwalk, among many others.

12. Consistent with the number of fields it has installed in Connecticut, FieldTurf has an outstanding reputation within the State. However, that reputation is also vulnerable to attack

because of the nature of FieldTurf's customer base. FieldTurf's customers are regularly public entities, like schools and municipalities, that are sensitive to claims of improper business conduct even if unfounded.

## II. The Colchester BOE's Overhaul of the Bacon Academy Athletic Facilities and FieldTurf's Role in the Project

13. In the fall of 2023, the Town of Colchester Board of Education ("Colchester BOE") began considering upgrading the athletic facilities at the Bacon Academy campus.

14. In late November 2023, McCoy personally lobbied the Colchester superintendent, Daniel Sullivan (the "Colchester Superintendent"), for KBA to be selected as the architect to perform design services for the contemplated Bacon Academy project.

15. When the Colchester Superintendent informed McCoy that the Colchester BOE was considering FieldTurf for the project, McCoy became visibly agitated and complained that he is a "local guy" who deserves to be part of the project. He then suggested—without any basis—that the process for selecting FieldTurf might not be legal.

16. In mid-January 2024, the Colchester Board of Selectmen, responsible for overseeing and managing the internal operations of the Town, began considering forming a committee to evaluate Colchester's current recreation assets operated by Colchester BOE, including the athletic facilities at the Bacon Academy, and to make recommendations on how to coordinate use and access to those resources.

17. Around the same time, FieldTurf presented Colchester BOE and the Colchester Superintendent, with a proposal for a comprehensive plan to enhance the athletic facilities at the Bacon Academy campus.

18. The proposal encompassed a complete overhaul of the Bacon Academy's stadium field, baseball field, softball field, and tennis courts. It included topsoil removal and turf product

installation, with the goal of creating state-of-the-art facilities that would maximize playability while minimizing the impact on the surrounding areas (the "Bacon Academy Project").

19. On March 15, 2024, after applying for the role, McCoy interviewed with the Colchester Board of Selectmen to be part of the committee to evaluate Colchester's current recreation assets, including the athletic facilities at the Bacon Academy.

20. One of the Selectmen members asked McCoy if "there would be any kind of a conflict," given that "you work for somebody [*i.e.*, KBA] that does exactly what we're looking into especially with the fields." McCoy responded, "as far as a study and this kind of stuff, we don't do construction, we don't sell products, we sell design and assessment, so it's literally the same thing" doing this work for the committee and "not charging for it."

21. Importantly, McCoy said that "he's already talked to his company," and they know that being on the recreation committee, "*we* [*i.e.*, KBA] wouldn't be chasing this" project. However, he acknowledged that after the recreation committee's work concluded, if the Town decided to move forward with the Bacon Academy Project then KBA "would reassess" the situation. KBA was thus aware of McCoy's involvement in the committee, and both KBA and McCoy understood that it could lead to future work for the firm.

22. In April 2024, the Colchester Board of Selectmen officially formed the Recreation Needs and Coordination Ad Hoc Committee (the "Ad Hoc Committee"). McCoy was selected to sit on the Ad Hoc Committee. The other members of the committee include Michael Dubreuil, Kyle Calash, Matthew Parsons, Suzanne Salemi, Christopher Pianta, David Emery, Nina Minella, and Seth Breitmaier (the "Ad Hoc Committee Members").

23. The Colchester Board of Selectmen tasked the Ad Hoc Committee with assessing Colchester's existing recreation spaces and resources with a focus on "evaluating the need,

feasibility, and potential public support for a turf field." One such recreational space was the Bacon Academy Project. The Ad Hoc Committee was required to "[e]xamine proposals for Bacon Academy athletic complex and make [a] prioritized recommendation" by considering the "pros, cons, financial costs, and evaluate public support for artificial turf vs grass fields."

24. Subsequently, the Colchester BOE entered into a contract with FieldTurf to perform design services for the Bacon Academy Project. While this initial contract only covered design work, FieldTurf intended to compete for the subsequent construction contract to implement these designs, and, as the project's designer and a leading artificial turf contractor, FieldTurf was well-positioned to do so.

### III. Defendants' Defamatory, Tortious, and Unfair Conduct

25. Having failed to secure the design work for KBA through proper channels, Defendants embarked on a months-long effort to disparage FieldTurf and interfere with its business relationships with the Colchester BOE, as detailed below. Although McCoy took the lead in this campaign, at all times acting within the scope of his employment and in furtherance of KBA's business interests. On information and belief, KBA was aware of and approved of his conduct, including his public and repeated defamatory statements.

#### A. Defendants' Statements During the March Board of Selectmen Meetings

26. During the March 7, 2024, Regular Meeting of the Colchester Board of Selectmen, McCoy called into the meeting to "suggest" that the Board "look into the particular contractor" with whom the Colchester BOE was pursuing the Bacon Academy Project, an obvious reference to FieldTurf.

27. McCoy proceeded to state that the "proposed plan is not publicly bidding" and claimed that the "proposed contractor"—FieldTurf—"is personal friends with the superintendent

6

and it hasn't been disclosed yet at all to the public." In other words, he falsely accused FieldTurf of having a concealed, improper relationship with the Colchester Superintendent.

28. McCoy either knew this statement to be false when made or uttered it with reckless disregard for its truth because he had no basis for the charged accusation. Indeed, at the April 16, 2024, Colchester BOE meeting, the Colchester Superintendent addressed this accusation and unequivocally denied it:

> In recent weeks several public comments have been made that either allege or imply that I have close personal relationships with contractors, ***that is not true***. As Board of Education members know, one contractor that we've spoken with is my former landlord and also a parent when I was a high school principal. We never spent time socially, nor do we exchange Christmas cards. We didn't contact him because of a personal relationship, we contacted him because field construction is a niche business, and his company is highly respected.

29. At the next Regular Meeting of the Colchester Board of Selectmen, March 12, 2024, McCoy said that he "strongly suggest" the board discuss with corporate counsel before moving forward with certain projects, including the potential Bacon Academy Project, because it purportedly "bypass[es] the typical municipal procurement process," which he claimed is "going to open up this board to litigation." This statement, as with his other disparaging comments, was completely unfounded and was intended to disparage FieldTurf and to disadvantage it in future contract discussions.

30. At neither the March 7 meeting nor the March 12 Board of Selectmen meetings did McCoy disclose that he and his architectural firm were competitors to FieldTurf in the market for athletic field design. Nor did McCoy disclose that he had lobbied the Colchester Superintendent for KBA to be selected as the architect for the Bacon Academy Project and that he and his firm planned to continue to urge the Colchester BOE to select an alternative field

manufacturer for the Bacon Academy Project (the "FieldTurf Competitor"). Instead, McCoy falsely portrayed himself merely as a disinterested local resident.

31. Although FieldTurf currently does not know whether there is a formal business relationship between KBA and the FieldTurf Competitor, on information and belief, KBA has worked with the FieldTurf Competitor on dozens of projects within Connecticut. On information and belief, KBA's specifications for Connecticut projects always dictate the use of the FieldTurf Competitor's shock pad product even though it is poorly suited to Connecticut's winter climate.

32. Indeed, just a month earlier, McCoy had emailed the Colchester BOE to promote the FieldTurf Competitor. After showering the Colchester BOE with superlatives, McCoy stated: "I also wanted to make an introduction to [a sales representative] with [the FieldTurf Competitor]. He has a unique background and many other districts have found [*sic*] is perspective and insight to be very helpful when trying to move projects like this forward."

33. But if there were any doubts about McCoy's intentions, he laid them bare during the March 14 Board of Selectmen meeting. He lamented that Bacon Academy Project had purportedly "push[ed] forward a plan" and "hired supposedly a designer already," even though it "hasn't even come before this group"—revealing his dissatisfaction that a company other than KBA may be engaged for field design work for the Bacon Academy Project.

34. Following McCoy's statements, FieldTurf's outside counsel sent McCoy a letter informing him that FieldTurf was aware of his improper "efforts to drive business away from FieldTurf toward competing firms—either to KBA or a field manufacturer with whom you/KBA have a relationship" and requested that he immediately stop "making any false statements or implications, or unfounded threats, aimed toward unfairly interfering with FieldTurf's prospective business interests."

35. This letter was sent to McCoy at both his personal and business addresses, thereby ensuring that KBA was informed of his misconduct.

36. McCoy's array of disparaging statements also prompted the Colchester BOE to caution McCoy against making further defamatory statements. On April 4, 2024, the Colchester BOE's outside counsel (on behalf of the Colchester Superintendent) sent McCoy a letter stating that "[i]t has been brought to our attention that you have participated in public comment at public meetings in Colchester and alleged that the Superintendent is 'personal friends' with a proposed contractor who is being considered for installation of a turf field." The letter did not mince words: "[p]lease be advised that making false statements that affect the reputation of an individual is defamation."

### B. Defendants Continue Their Pattern of Disparagement and Interference at the November 6 Ad Hoc Committee Meeting

37. Nevertheless, McCoy continued to attack FieldTurf. On November 6, 2024, during an Ad Hoc Committee meeting, McCoy made false and disparaging statements regarding one of FieldTurf's subcontractors, Liberty Landscapes, LLC ("Liberty"), that is currently under consideration to install FieldTurf products for the Bacon Academy Project.

38. At the meeting, McCoy stated to the Ad Hoc Committee Members, the First Selectman Bernie Dennler of the Colchester Board of Selectmen, and other Colchester BOE members that he was offered a bribe by an employee of Liberty. McCoy provided no support or evidence for this false and defamatory statement.

39. Liberty has forcefully denied that any bribe or improper offer was ever made to McCoy.

40. McCoy knew that his accusation was false or at a minimum made this accusation with reckless disregard for its truth.

9

41. McCoy intended this accusation to damage FieldTurf's reputation by implying that it had been awarded the contract for design services at Bacon Academy through illegal and improper means and that it would be using similar efforts to obtain future contracts. Moreover, he knew that such an accusation would be particularly harmful because it involved the procurement process for a public entity.

42. As any reasonable person would have foreseen, there was an immediate public response to McCoy's bribery accusation. Dennler promptly emailed the rest of the Board, the Ad Hoc Committee, and the Colchester Superintendent, informing them that "[l]ast week, a member of the Recreation Needs and Coordination Ad Hoc Committee alleged possible bribery directed toward him by a subcontractor affiliated with a company currently performing design services for the Board of Education."

43. But because "our boards do not have the ability to properly investigate such a claim," he continued, "I reached out to the state attorney's office today. On their advice, I will be filing a police report so that this matter can be investigated by the proper authorities." Dennler made clear, however, "that the Town takes no position regarding the veracity of the allegation."

44. Importantly, in the police report that was ultimately provided to the state attorney's office, Mr. Dennler also made clear that the Liberty employee "reached out directly to [him] to deny this allegation." Additionally, "[d]uring the brief conversation, he denied having anything except passing contact with" McCoy.

45. In the wake of the police report, local news stories publicized McCoy's false and defamatory bribery accusation. The Rivereast News Bulletin (published by The Glastonbury Citizen) ran a frontpage story on McCoy's false accusations. The Connecticut Inside Investigator published a story repeating McCoy's false statements entitled "Allegations of attempted bribery

rock Colchester." Each article publicly linked FieldTurf to McCoy's false and defamatory accusation.

46. This negative press coverage, sparked by McCoy's defamatory statements, has impugned FieldTurf's business integrity and professional reputation causing it irreparable harm. This harm will only continue if McCoy continues to make false and disparaging statements about FieldTurf and individuals and entities associated with FieldTurf. The widespread dissemination of these false allegations of attempted bribery has created a cloud of suspicion that threatens to derail FieldTurf's existing and future work for the Bacon Academy Project. In fact, these statements threaten to imperil FieldTurf's projects in nearby communities totaling many millions of dollars.

**C. Defendants Double Down on their Disparagement at the November 20 Ad Hoc Committee Meeting**

47. On November 16, 2024, FieldTurf sent Defendants a letter requesting that, by no later than November 20, 2024, they provide (1) written confirmation that they will cease and desist from making any further defamatory statements about FieldTurf and its subcontractors, and (2) a retraction of prior false statements about Liberty.

48. In response to the letter, a lawyer responded on behalf of both McCoy and KBA, thereby demonstrating that KBA was aware of and approved of his conduct. Defendants' counsel asserted that there was nothing to retract because McCoy had never disparaged FieldTurf. As he put it: "You have been misinformed. Mr. McCoy has not made any false or disparaging statements about either FieldTurf or Liberty Landscapes – either now or previously."

49. At the very next Ad Hoc Committee Meeting, on November 20, 2024, McCoy reaffirmed his bribery accusation instead of retracting it. A member of the committee made a motion to amend the November 6 Ad Hoc Committee minutes to state that "a committee member

11

[*i.e.,* McCoy] informed the committee there was an attempt to bribe them by FieldTurf." After discussion, McCoy stated that he did not say it was a "bribe." But McCoy then seconded a motion to amend the November 6 minutes to state that he "was approached by a subcontractor [*i.e.*, Liberty] and asked what it would take to walk away."

50. At that same Meeting, McCoy made a new false and defamatory statement about FieldTurf. In response to a discussion about field recycling, he stated that while FieldTurf claims it has a recycling plant located in Pennsylvania, that is not the case. In so doing, McCoy falsely portrayed FieldTurf as a company that misleads its customers.

51. As with McCoy's earlier defamatory comments, this statement was knowingly false or made with reckless disregard for the truth. FieldTurf has been operating a recycling plant since June 2023, which has successfully recycled more than twenty complete artificial turf fields.

52. McCoy, given his experience in the artificial turf industry and his role on the Ad Hoc Committee in evaluating artificial turf proposals for the Bacon Academy Project, knew or should have known these facts when he made his false statement about FieldTurf's recycling capabilities.

## **FIRST CAUSE OF ACTION**
### **(Against Defendant Luke McCoy For Defamation)**

53. FieldTurf repeats and re-alleges paragraphs 1 through 52 hereof as though fully set forth herein.

54. On March 7, March 12, November 6, and November 20, 2024, McCoy made the following statements to the Ad Hoc Committee Members, the Colchester Board of Selectmen (including First Selectman Bernie Dennler), and other Colchester BOE members:

   a) insinuated that there was a concealed, improper relationship between FieldTurf's subcontractor, Liberty, and the Colchester Superintendent;

b) "suggest[ed]" that the Board of Selectmen "look into the particular contractor," *i.e.*, FieldTurf, implying some kind of impropriety on FieldTurf's behalf;

c) that the Colchester BOE's selection of FieldTurf for the Bacon Academy Project was somehow not legal because it supposedly "bypass[ed] the typical municipal procurement process";

d) that "there was an attempt to bribe [McCoy] by FieldTurf";

e) that a representative for Liberty approached McCoy and offered him a bribe by asking him "what it would take to walk away" and not serve on the Ad Hoc Committee; and

f) that FieldTurf's claims that it utilizes a recycling plant in Pennsylvania was a lie.

55. McCoy's defamatory statements, communicated to third parties, were false and defamatory and were known to McCoy to be false and defamatory and/or were made with reckless disregard for the truth. Further, the statements were defamatory per se by suggesting that FieldTurf engages in and encourages illegal conduct.

56. The foregoing statements were made with intentional disregard for their truth, motivated primarily by McCoy's desire to win business by disadvantaging FieldTurf as a competitor. McCoy's persistence in making these statements despite multiple opportunities to desist suggests they were made to advance KBA's commercial interests through deliberate attempts to damage FieldTurf's reputation and business prospects.

57. As a direct consequence of these statements, FieldTurf's reputation both within Connecticut and throughout the United States has been severely tarnished.

58. As a direct result of the forgoing, FieldTurf has suffered, and will continue to suffer, serious and irreparable harm and damages. FieldTurf has been, and will continue to be, injured in its efforts to sell its products and services, including to municipal governments like the Town of Colchester. FieldTurf accordingly seeks compensatory damages, punitive damages, special damages, and attorneys' fees as proof at trial may warrant.

## SECOND CAUSE OF ACTION
### (Against All Defendants For Tortious Interference with Contractual Relations)

59. FieldTurf repeats and re-alleges paragraphs 1 through 58 hereof as though fully set forth herein.

60. FieldTurf has a contract with the Colchester BOE to perform design services for the Bacon Academy Project.

61. Defendants knew of FieldTurf's contractual relationship with the Colchester BOE and have intentionally attempted to interfere with this contractual relationship through McCoy's material misrepresentations and defamatory statements. Specifically, McCoy made material misstatements to the Ad Hoc Committee Members, the Colchester Board of Selectmen (including First Selectman Bernie Dennler), and other Colchester BOE members, including by falsely claiming that a representative from Liberty attempted to bribe McCoy; implying some impropriety on FieldTurf's behalf by calling for the Colchester Board of Selectmen to investigate FieldTurf; and falsely claiming that FieldTurf's subcontractor, Liberty, had an improper relationship with the Colchester Superintendent.

62. McCoy made the aforementioned statements while acting within the scope of his employment and for the benefit of KBA. Indeed, McCoy's conduct was directly tied to KBA's business interests: He had personally lobbied the Colchester Superintendent for KBA to be selected as the architect to perform design services for the Bacon Academy Project, and he represented to the Colchester Board of Selectmen that while his membership on the Ad Hoc Committee temporarily precluded KBA from pursuing work on the project, KBA would reconsider vying for the work once the committee disbanded. Through these actions, McCoy acted to advance KBA's business interests and within his authority as a principal of KBA. Thus, KBA is vicariously liable for McCoy's tortious interference with FieldTurf's contractual

14

relationship with the Colchester BOE.

63. McCoy is also a principal of KBA, and the latter ratified McCoy's conduct by taking no actions to cause him to refrain from his tortious activities despite its actual knowledge of them.

64. As a direct and proximate result of the foregoing, KBA's conduct is impairing FieldTurf's ability to obtain the benefits of the Bacon Academy contract and/or to obtain future related contracts from the BOE.

65. FieldTurf has been, and will continue to be, injured in its efforts to sell its products and services to the Bacon Academy and potentially secure future contracts with the BOE. FieldTurf accordingly seeks compensatory damages, punitive damages, special damages, and attorneys' fees as proof at trial may warrant.

## THIRD CAUSE OF ACTION
**(Against All Defendants For Tortious Interference with Business Expectancies)**

66. FieldTurf repeats and re-alleges paragraphs 1 through 65 hereof as though fully set forth herein.

67. FieldTurf has had substantial and on-going business expectancy relationships with its customers and potential customers, including, but not limited to, the Town of Colchester and the Colchester BOE.

68. Defendants knew of FieldTurf's business relationships with its customers and potential customers, including the Colchester BOE, and has intentionally attempted to interfere with the business relationships of those customers and potential customers to divert or attempt to divert their business away from FieldTurf through McCoy's material misrepresentations and defamatory statements. Specifically, McCoy made material misstatements to the Ad Hoc Committee Members, the Colchester Board of Selectmen (including First Selectman Bernie

15

Dennler), and other Colchester BOE members, including by falsely claiming that a representative from Liberty attempted to bribe McCoy, implying some impropriety on FieldTurf's behalf by calling for the Colchester Board of Selectmen investigate FieldTurf, and falsely claiming that FieldTurf's subcontractor, Liberty, had an improper relationship with the Colchester Superintendent.

69. McCoy made the aforementioned statements while acting within the scope of his employment and for the benefit of KBA. Indeed, McCoy's conduct was directly tied to KBA's business interests: He had personally lobbied the Colchester Superintendent for KBA to be selected as the architect to perform design services for the Bacon Academy Project, and he represented to the Colchester Board of Selectmen that while his membership on the Ad Hoc Committee temporarily precluded KBA from pursuing work on the project, KBA would reconsider vying for the work once the committee disbanded. Through these actions, McCoy acted to advance KBA's business interests and within his authority as a principal of KBA. Thus, KBA is vicariously liable for McCoy's tortious interference with FieldTurf's business expectancy relationships with the Colchester BOE.

70. McCoy is also a principal of KBA, and the latter ratified McCoy's conduct by taking no actions to cause him to refrain from his tortious activities despite its actual knowledge of them.

71. By its aforementioned actions, KBA intentionally, maliciously, and without justification interfered with FieldTurf's prospective contractual and/or business relationships with the Colchester BOE to perform construction work to implement the designs that FieldTurf created for the Bacon Academy Project.

72. As a direct and proximate result of the foregoing, FieldTurf has suffered, and will continue to suffer, serious and irreparable harm and damages. KBA's conduct deprived FieldTurf of the value of future business that would have otherwise been awarded.

73. FieldTurf has been, and will continue to be, injured in its efforts to sell its products and services to the Colchester BOE and potentially other customers that would have otherwise awarded FieldTurf future business. FieldTurf accordingly seeks compensatory damages, punitive damages, special damages, and attorneys' fees as proof at trial may warrant.

## FOURTH CAUSE OF ACTION
**(Against All Defendants For Violation of the Connecticut Unfair Trade Practices Act)**

74. FieldTurf repeats and re-alleges paragraphs 1 through 73 hereof as though fully set forth herein.

75. FieldTurf is a person within the meaning of C.G.S. §§ 42-110a(3) entitled to bring an action under the Connecticut Unfair Trade Practices Act ("CUTPA"), C.G.S. § 42-110a, *et seq*.

76. At all relevant times, Defendants were engaged in trade or commerce within the meaning of C.G.S. § 42-110a *et seq*.

77. The foregoing actions by McCoy within the scope of his employment and to further the interests of KBA constitute unfair and deceptive acts and practices in the conduct of trade or commerce that are unethical, unscrupulous, and offensive to public policy, and are a violation of C.G.S. § 42-110b(a).

78. McCoy is also a principal of KBA, and the latter ratified McCoy's conduct by taking no actions to cause him to refrain from his tortious activities despite its actual knowledge of them.

79. As a result of the foregoing unfair and deceptive acts and practices, including the interference with FieldTurf's contractual and/or business expectancy relationships with the Town of Colchester and Colchester BOE in bad faith, and the false statements made to Ad Hoc Committee Members, the Colchester Board of Selectmen, and other Colchester BOE members, FieldTurf has suffered an ascertainable loss within the meaning of C.G.S. § 42-110g(a) and has suffered damages in an amount to be determined at trial. Because McCoy committed these acts within the scope of his employment and in furtherance of KBA's interests, KBA is vicariously liable for his unfair and deceptive conduct.

80. The foregoing actions of Defendants were calculated, deceitful and unfair, and were, at least, recklessly indifferent to the rights of FieldTurf, and, at most, were wanton and malicious. Accordingly, Defendants are liable to FieldTurf for punitive damages, attorney fees and costs, pursuant to C.G.S. § 42-110g(a) and § 42-110g(d).

81. A copy of this complaint is being mailed to the Connecticut Office of the Attorney General and the Commissioner of Consumer Protection, pursuant to General Statutes § 42-110g(c).

**DEMAND FOR RELIEF**

**WHEREFORE**, Plaintiff prays for relief and judgment, including:

a. against Defendants on Plaintiff's first through fourth causes of action, awarding Plaintiff damages in an amount to be determined at trial;

b. enjoining Defendants from making further defamatory statements about FieldTurf, its subcontractors, or prospective clients;

c. punitive and special damages in the maximum amount permitted by law including punitive damages, pursuant to C.G.S. § 42-110g(a);

d. interest, costs, and expenses incurred in this action including costs and attorneys' fees, pursuant to C.G.S. § 42-110g(d);

e. a jury trial on all matters that may be tried to a jury; and

f. such other and further relief as the Court deems just and proper.

Respectfully submitted,

*/s/ David R. Roth*
David R. Roth (ct29876)
James O. Craven (ct18790)
WIGGIN AND DANA LLP
265 Church Street
New Haven, CT 06510
(203) 498-4400 (tel.)
(203) 782-2889 (fax)
droth@wiggin.com
jcraven@wiggin.com

GLENN AGRE BERGMAN & FUENTES LLP

L. Reid Skibell (*pro hac vice* forthcoming)
George L. Santiago (*pro hac vice* forthcoming)
1185 Avenue of the Americas, 22nd Floor
New York, New York 10036
T: 212-970-1600
rskibell@glennagre.com
gsantiago@glennagre.com

*Attorneys for Plaintiff*